| | | | |
|---|---|---|---|
| **PARKER ANTRON COLEMAN,** | ) | | |
| | ) | | |
| **Petitioner,** | ) | | |
| | ) | | |
| **vs.** | ) | **ORDER** | |
| | ) | | |
| **UNITED STATES OF AMERICA,** | ) | | |
| | ) | | |
| **Respondent.** | ) | | |
| ———————————————————— | ) | | |

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255, (Doc. No. 1), and Amended § 2255 Motion to Vacate, (Doc. No. 2).

## I.    BACKGROUND[1]

Petitioner was indicted along with 20 co-defendants in a marijuana distribution conspiracy. (Crim. Case No. 3:10-cr-238, Doc. No. 152). The charges pertaining to Petitioner are: **Count (1)**, conspiracy to possess with intent to distribute 1,000 kilograms or more of marijuana in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846 from in or about 2009 to the present;[2] **Count (2)**, conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i), and (h); **Count (3)**, possession with intent to distribute a detectable amount of marijuana in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(D), and 18 U.S.C. § 2; **Count (4)**, using and carrying one or more firearms during and in furtherance of a drug trafficking crime, that is, possession with

---

[1] This section summarizes the proceedings and evidence for the sake of brevity.
[2] The Third Superseding Indictment was filed on April 19, 2011.

intent to distribute marijuana as charged in Count (3), and aiding and abetting the same in violation of 18 U.S.C. §§ 924(c) and 2 on or about November 2, 2010; **Counts (5) & (7)**, possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1); and **Count (6)**, using and carrying one or more firearms during and in furtherance of a drug trafficking crime, that is, conspiracy to possess with intent to distribute marijuana as charged in Count (1), and aiding and abetting the same in violation of 18 U.S.C. §§ 924(c) and 2 on or about November 16, 2010. (<u>Id.</u>).

The Government filed a notice of seeking a sentencing enhancement pursuant to 18 U.S.C. § 851 based on Petitioner's prior Mississippi conviction for possession of 6.7 kilograms of marijuana. (<u>Id.</u>, Doc. No. 218).

During jury selection, venire member Timothy Shaw informed the Court that he had "met [prosecutor] Mr. Kauffman a few times at a local park" where their kids play. (3:10-cr-238, Doc. No. 651 at 43-44). Shaw had no other personal or professional relationship with the prosecutor. (<u>Id.</u>, Doc. No. 651 at 44). The Court asked whether there is "anything about that relationship that [Shaw] had with Mr. Kauffman outside of court [that would] affect [his] ability to be fair and impartial" and Shaw responded "I don't think so." (<u>Id.</u>, Doc. No. 651 at 44). Shaw confirmed that he could listen to both sides and give both sides a fair hearing. (<u>Id.</u>, Doc. No. 651 at 44). The Court denied Petitioner's motion to reopen jury selection because the Court was satisfied that Shaw had "minimal contact" with the prosecutor and both sides had a fair opportunity to use their peremptory strikes. (3:10-cr-238, Doc. No. 652 at 4). Counsel argued that the motion to reopen should be granted because the Court's jury selection system had confused counsel. (<u>Id.</u>, Doc. No. 652 at 5). The Court noted that counsel had prior trial experience before the Court and, in any event, "we've chosen a jury comprised of individuals who have indicated their willingness to be fair and keep an

open mind and judge the case based on the evidence and the instructions….” (<u>Id.</u>, Doc. No. 652 at 5-6).

Stephanie Peppers testified that she met Petitioner in 2007 when she was his probation officer in a marijuana trafficking case. (3:10-cr-238, Doc. No. 654 at 22). The two became romantically involved in January 2008, so she resigned her job in February 2008 and they began living together. Petitioner was determined to establish a drug business so he networked and met people. (<u>Id.</u>, Doc. No. 654 at 25-26). Petitioner introduced Peppers to his friend “Champ” (Gerren Darty) and asked Peppers to rent a car for him which she did. (<u>Id.</u>, Doc. No. 654 at 29). Peppers gave Petitioner $5,000 in February or March 2009 from her tax return so that Petitioner could buy marijuana from California which he promised to repay when he sold the drugs. (<u>Id.</u>, Doc. No. 654 at 31). Petitioner found a source of marijuana supply in California, “Turtle” (Milton Adams). (<u>Id.</u>). Within a week or two of giving Petitioner the money, Petitioner and Champ made a trip to California and returned with marijuana. (<u>Id.</u>, Doc. No. 654 at 32). Soon Petitioner started sending couriers from Charlotte to California with money – on average $50,000 – and they would return with two suitcases filled with 50 pounds of marijuana each. (<u>Id.</u>, Doc. No. 654 at 34). Peppers acted as a courier on approximately 20 occasions for Petitioner. (<u>Id.</u>, Doc. No. 654 at 40). When Peppers would get to California, someone would pick her up at the airport then she would go to Turtle’s house and he would count the money.

Peppers testified that she saw Petitioner with guns on several occasions. She saw four handguns that Petitioner said he got from one of the Charlotte-based couriers. (<u>Id.</u>, Doc. No. 654 at 45-46). In 2009, Petitioner gave Peppers money and told her to buy him a Glock. She knew he was not allowed to lawfully possess a firearm but she nevertheless bought two guns for him. (<u>Id.</u>, Doc. No. 654 at 52). In Fall 2010, Petitioner brought another gun into her house that was an assault

type rifle. (Id., Doc. No. 654 at 47). She saw him pull guns out from under the bed and handle them with a t-shirt or black gloves. (Id., Doc. No. 654 at 48). Peppers further testified that Petitioner had a compartment installed behind the passenger seat of the white Porsche SUV that he drove. Petitioner had the compartment installed in California with Turtle's help. (Id., Doc. No. 654 at 50). Peppers saw a gun in the compartment when Petitioner asked her to retrieve money for him. (Id.). Petitioner had also used the Porsche to transport Peppers to and from the airport on several occasions when she couriered drugs and money for him. (Id., Doc. No. 654 at 39).

Another woman who had dated Petitioner for a couple of months in 2009, Natasha Rodriguez, also testified that Petitioner drove a white Porsche that had a compartment hidden behind a seat. (Id., Doc. No. 653 at 197-98, 205-06). Petitioner discussed traveling to California in front of Rodriguez. (Id., Doc. No. 653 at 199-200). She saw him break down big packages of marijuana using scales and she smelled the strong odor of marijuana coming from his garage. (Id., Doc. No. 653 at 203). Rodriguez also saw Petitioner with a number of firearms including one in a closet and one in his bedroom that he handled while wearing gloves. (Id., Doc. No. 653 at 206-07). Petitioner gave Rodriguez an Audi for her graduation and she saw him in possession of large amounts of cash. (Id., Doc. No. 653 at 195, 202, 205).

In July 2010 Petitioner got pulled over for DWI in the white Porsche and around $40,000 got seized. Petitioner asked Peppers to say that the money was hers to get the money back. (Id., Doc. No. 654 at 59). Peppers refused because she did not have adequate receipts from her restaurant/catering business to show that she had that much cash.

In summer 2010, Peppers began depositing money into bank accounts for Petitioner rather than taking cash to California on airplanes. (Id., Doc. No. 654 at 62). Petitioner would text Peppers with a name, account number, and a bank branch, and Peppers would make deposits of between

$5,500 and $9,000; they were never over $9,000. (Id., Doc. No. 654 at 62). The recipients of the deposits included Turtle and Turtle's girlfriend. (Id., Doc. No. 654 at 60).

Officers obtained a warrant to search Petitioner's apartment on November 2, 2010. (Cr-DE# 652 at 141). When officers entered the apartment they found mail addressed to him and smelled the strong odor of fresh marijuana. (3:10-cr-238, Doc. No. 652 at 143, 152). Officers found cash totaling $92,000 in a safe in the master bedroom closet, in the kitchen area, and in a closet near the front door. (Id., Doc. No. 652 at 148). Officers found a loaded Glock firearm, magazines, and 29 bullets underneath the bed in the master bedroom. (Id., Doc. No. 652 at 151). The master bedroom closet also held a money counter, cash, money wrappers, and three cell phones. (Id., Doc. No. 652 at 152, 154, 156, 157). The kitchen held Ziploc baggies that are commonly used to package marijuana for sale. (Id., Doc. No. 652 at 153-54). Officers found .6 grams of marijuana near the front closet. (Id., Doc. No. 652 at 158).

On November 16, 2010, officers received information that there were firearms in a compartment behind the passenger seat of a white Porsche SUV that was at a dealership for repairs. The compartment would be within reach of someone sitting in the Porsche's driver seat. Officers learned that Petitioner would be picking up his Porsche from the dealership and went there to await his arrival. (Id., Doc. No. 652 at 106). Petitioner and Champ came to the dealership and Petitioner went inside to pay the bill. The two men got into the car to drive away and were stopped by officers. A search revealed two semi-automatic pistols in a compartment behind the passenger seat, at least one of which was loaded. (Id., Doc. No. 652 at 108). Petitioner was arrested.

After Petitioner's arrest, he asked Rodriguez to get some papers together saying that he had catered her aunt's wedding, which was untrue, and asked her to write out receipts for events at her

grandmother's church in which he had no business involvement. (Id., Doc. No. 653 at 207, 213-16).

Co-conspirator Samatha Jo Schmidlin testified that she pled guilty to taking part in the conspiracy and identified Petitioner as one of her co-conspirators. (Id., Doc. No. 653 at 159-60). Starting in November or December 2009, she would go to Petitioner's house to pick up money, then go to Turtle's house in California and come back on an airplane with 50 to 70 pounds marijuana inside suitcases. (Id., Doc. No. 653 at 161, 167-68). She got caught in the airport during her fifth trip, which was on February 21, 2010. (Id., Doc. No. 653 at 162-63).

Co-conspirator Harold Manigault testified that he pled guilty in the conspiracy and identified Petitioner as a co-conspirator. Manigualt took 10 trips between Charlotte and California for Petitioner, each of which would involve two suitcases containing 50 pounds of marijuana each. (Id., Doc. No. 653 at 231). He also sold small amounts of marijuana. (Id., Doc. No. 653 at 238). Manigault testified that Petitioner always kept a firearm in his bedroom on the windowsill. (Id., Doc. No. 653 at 236-37). Manigault, who was a childhood friend of Petitioner's, felt bad about testifying but had no choice because of his plea agreement. (Id., Doc. No. 653 at 229).

Co-conspirator William Pierce testified that he pled guilty in the marijuana trafficking and money laundering conspiracy of which Petitioner was a leader. (Id., Doc. No. 654 at 135). Pierce lived in Los Angeles and saw Petitioner there five or 10 times to purchase marijuana. (Id., Doc. No. 654 at 135). Pierce would purchase plane tickets, transport people back and forth from the airport, prepare bags filled with marijuana for the airport, and count money in amounts up to $60,000. (Id., Doc. No. 654 at 136-37). Pierce also traveled to Charlotte during the conspiracy. Peppers would pick him up and he would stay with Petitioner. While Pierce was in Charlotte, they

would count money, wait for people to come pick up drugs, and weigh the marijuana on digital scales in Petitioner's garage. (Id., Doc. No. 654 at 140).

To sum, the evidence was overwhelming. A jury found Petitioner guilty of all seven counts and specifically found with regards to Count (1) that it was reasonably foreseeable that the substance containing marijuana weighed 1,000 kilograms or more. (Id., Doc. No. 490).

The presentence investigation report ("PSR") grouped Counts (1), (2), (3), (5) and (7),[3] and scored the base offense level as 34 and added two levels for the use or credible threat of violence, and two more levels for maintaining premises for the purpose of manufacturing or delivering a controlled substance. (Id., Doc. No. 628 at ¶ 52). Two more levels were added because Petitioner was convicted under § 1956, and four levels were added for his role in the offense. (Id., Doc. No. 628 at ¶¶ 53, 55). No Chapter Four enhancements were added. (Id., Doc. No. 628 at ¶ 66). The total offense level for the group was 43. (Id., Doc. No. 628 at ¶¶ 67, 69).

The PSR's criminal history section scored two points for a Mississippi conviction for possession of five kilograms or more of marijuana with intent to sell, barter, transfer, dispense, or otherwise deliver to a person or persons unknown, for which he was sentence to 10 years' imprisonment, nine years of which was suspended, and five years of probation. (Id., Doc. No. 628 at ¶ 75, 76). Two points were added because Petitioner committed the instant offense while he was under a criminal justice sentence for the Mississippi offense, resulting in a total criminal history score of four and a criminal history category of III. (Id., Doc. No. 628 at ¶¶ 77, 78). The resulting guidelines imprisonment range was life plus the term of imprisonment required by statute for Counts (4) and (6). (Id., Doc. No. 628 at ¶ 103).

---

[3] The statutory term of imprisonment applied to Counts (4) and (6). (Id., Doc. No. 628 at ¶¶ 70, 71).

The Court adopted the PSR except for the enhancements for a credible threat of violence and use of premises to manufacture or distribute a controlled substance. The resulting total offense level for the Counts (1), (2), (3), (5) and (7), was 40 and the advisory sentencing range was 360 months to life imprisonment. (Id., Doc. No. 656 at 7). The Court sentenced Petitioner to a total of 60 years in prison followed by 10 years of supervised release. (Id., Doc. No. 635).

Petitioner argued on direct appeal that the Court erred by: (1) failing to suppress evidence seized from his residence; and (2) admitting evidence about a prior conviction and his romantic relationship with a co-defendant who was his probation officer in that case. The Fourth Circuit affirmed, United States v. Coleman, 585 Fed. Appx. 299 (4th Cir. 2014), and the United States Supreme Court denied certiorari on April 20, 2015, Coleman v. United States, 136 S.Ct. 1883 (2015).

Petitioner filed the original § 2255 Motion to Vacate on April 13, 2016, in which he argues (renumbered): (1) trial counsel was ineffective for: (A) failing to move to suppress the fruits of the July 12, 2010, traffic stop and the tracking device placed on the white Porsche on November 4, 2010; (B) failing to object that Counts (4) and (6) are duplicitous; (C) failing to object to the sufficiency of the evidence/ constructive amendment with regards to Count (6); (D) allowing the prosecutor's personal friend and neighbor to be empaneled as a juror; (E) failing to effectively cross-examine government witnesses Stephanie Peppers and Mark Hunt; (F) failing to request appropriate jury instructions; (2) appellate counsel was ineffective for failing to challenge the sufficiency of the evidence; and (3) Petitioner is actually innocent of the aiding and abetting charged in Counts (4) and (6). Petitioner filed the Amended § 2255 Motion to Vacate on May 14, 2016, in which he argues pursuant to Johnson v. United States, 135 S.Ct. 2551 (2015), that (renumbered): (4)(A) the § 851 enhanced sentence in Counts (1) and (3) is not supported by a

predicate felony offense which counsel was ineffective for failing to raise at trial and on appeal; and (B) the § 924(c) convictions and sentences in Counts (4) and (6) are illegal because the predicate offense (conspiracy to distribute a detectable amount of marijuana as charged in Count (1)) does not have as an element the use, attempted use, or threatened use of physical force.[4]

## II.     STATUTE OF LIMITATIONS

A one-year period of limitations applies to § 2255 petitions. The limitation period runs from the latest of:

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255.

A federal judgment becomes final for purposes of 2255(f)(1) "when this Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari," or, if a petitioner does not seek certiorari, "when the time for filing a certiorari petition expires." Gonzalez v. Thaler, 565 U.S. 134, 149 (2012) (quoting Clay v. United States, 537 U.S. 522, 532 (2003)).

---

[4] The Amended § 2255 Motion to Vacate arguably superseded the original § 2255 Motion to Vacate, Young v. City of Mount Ranier, 238 F.3d 567, 573 (4th Cir. 2001), however, the Court is liberally construing the *pro se* Amended § 2255 Motion to Vacate as adding a Johnson claim without waiving the claims raised in the original § 2255 Motion to Vacate. See generally Haines v. Kerner, 404 U.S. 519 (1972) (a *pro se* complaint, however inartfully pled, must be held to less stringent standards than formal pleadings drafted by lawyers).

An untimely claim can relate back to the original timely-filed pleading if "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). In the context of a habeas motion, "conduct, transaction, or occurrence" does not mean the same "trial, conviction, or sentence," such that any claim that relates to the prior conviction or sentence challenged in a habeas motion is considered timely, no matter how long after the original motion it is filed. Rather, a proposed amendment relates back to the date of the original motion if it "state[s] claims that are tied to a common core of operative facts." Mayle v. Felix, 545 U.S. 644, 664 (2005).

Petitioner's conviction and sentence became final on April 20, 2015, when the United States Supreme Court denied certiorari review. See Clay, 537 U.S. at 532. Petitioner timely filed his original § 2255 petition on April 13, 2016. However, he filed the Amended § 2255 petition outside the one-year statute of limitations on May 14, 2016. The claims in the Amended § 2255 petition do not address the same core of operative fact and, therefore, they do not relate back to the original timely § 2255 petition. See Mayle, 545 U.S. at 664.

Petitioner appears to argue that it is timely pursuant to § 2255(f)(3) because it was filed within one year of Johnson's issuance. Johnson is inapplicable because Petitioner's § 851 enhancement and § 924(c) convictions rely on prior drug offenses rather than violent felonies. See, e.g., In re Williams, 826 F.3d 1351, 1356 (11th Cir. 2016) (in denying an application to file a second or successive § 2255 petition, noting that the § 851 enhancement was "not even arguably affected" by Johnson because the enhancement was based on prior felony drug offenses). Further, Petitioner was not sentenced under ACCA and the Supreme Court has not recognized new retroactive rights with regards to either §§ 851 or 924(c). See, e.g., United States v. Brown, 868 F.3d 297, 302 (4th

Cir. 2017) (holding that, because neither <u>Johnson</u>, <u>Beckles</u>,[5] or any other Supreme Court case has recognized the specific right on which petitioner sought to rely, the Court is "constrained by the Antiterrorism and Effective Death Penalty Act (AEDPA) jurisprudence from extrapolating beyond the Supreme Court's holding to apply what we view as its 'reasoning and principles' to different facts under a different statute or sentencing regime."), *certiorari denied*, <u>Brown v. United States</u>, 2018 WL 2877128 (Oct. 15, 2018); <u>United States v. Blackstone</u>, 903 F.3d 1020 (9th Cir. 2018) (holding that the Supreme Court has not recognized that § 924(c)'s residual clause is void for vagueness and therefore petitioner's <u>Johnson</u> claim was time-barred). Therefore, § 2255(f)(3) did not re-start the one-year statute of limitations for Petitioner to assert his sentencing claims.

Petitioner's Amended § 2255 petition will therefore be dismissed with prejudice as time-barred. Even if Petitioner's Amended § 2255 petition had been timely filed it would fail on the merits for the reasons set forth in the Discussion, Section (IV)(4) *infra*.

### III. PROCEDURAL DEFAULT

"Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." <u>Bousley v. United States</u>, 523 U.S. 614, 621 (1998) (internal citations omitted); <u>United States v. Sanders</u>, 247 F.3d 139, 144 (4th Cir. 2001). In order to collaterally attack a conviction or sentence based upon errors that could have been but were not pursued on direct appeal, a petitioner must show cause and actual prejudice resulting from the errors of which he complains or he must demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack. <u>See</u> <u>United States v. Frady</u>, 456 U.S. 152, 167-68 (1982); <u>United States v. Mikalajunas</u>, 186 F.3d 490, 492–93 (4th Cir. 1999); <u>United States v. Maybeck</u>, 23 F.3d 888, 891-92 (4th Cir. 1994). Actual prejudice is then shown by demonstrating that the error worked to

---

[5] <u>Beckles v. United States</u>, 137 S.Ct. 886 (2017) (holding that the Sentencing Guidelines are not subject to <u>Johnson's</u> void-for-vagueness challenge).

petitioner's "actual and substantial disadvantage," rather than just creating a possibility of prejudice. See Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir. 1997) (quoting Murray v. Carrier, 477 U.S. 478, 494 (1986)). To establish cause based upon ineffective assistance of counsel, a petitioner must show that the attorney's performance fell below an objective standard of reasonableness and that he suffered prejudice as a result. See Murray, 477 U.S. at 488; Strickland v. Washington, 466 U.S. 668, 687 (1984).

In order to demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack, a petitioner must show actual innocence by clear and convincing evidence. See Murray, 477 U.S. at 496. Under the actual innocence exception, "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ [of habeas corpus] even in the absence of a showing of cause for the procedural default." Id. (emphasis added). "In other words, a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims … on the merits notwithstanding the existence of a procedural bar to relief." McQuiggin v. Perkins, 569 U.S. 383, 393 (2013). This fundamental miscarriage of justice exception is grounded on the "equitable discretion" of habeas courts to see that "federal constitutional errors do not result in the incarceration of innocent persons." Herrera v. Collins, 506 U.S. 390, 404 (1993). To make such a showing, a petitioner must demonstrate that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Schlup v. Delo, 513 U.S. 298, 324 (1995).

**IV.    § 2255 STANDARD OF REVIEW**

A federal prisoner claiming that his "sentence was imposed in violation of the Constitution or the laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to

collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. Const. Amend. VI. To show ineffective assistance of counsel, Petitioner must first establish deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland, 466 U.S. at 687-88. The deficiency prong turns on whether "counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms." Id. at 688. A reviewing court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 689). The Strickland standard is difficult to satisfy in that the "Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." See Yarborough v. Gentry, 540 U.S. 1, 8 (2003). The prejudice prong inquires into whether counsel's deficiency affected the judgment. See Strickland, 466 U.S. at 691. A petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. In considering the prejudice prong of the analysis, a court cannot grant relief solely because the outcome would have been different absent counsel's deficient performance, but rather, it "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a "reviewing

court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), *vacated on other grounds*, 218 F.3d 310 (4th Cir. 2000).

"Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must ... prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." Kimmelman v. Morrison, 477 U.S. 365, 375 (1986); see also Bone v. Polk, 441 Fed. Appx. 193, 198 (4th Cir. 2011) (*per curiam*) (unpublished). A lawyer who fails to bring a futile motion to suppress has not provided deficient representation or prejudiced a defendant. See Truesdale v. Moore, 142 F.3d 749, 755-56 (4th Cir. 1998).

Strickland also applies in the context of appellate representation. To show prejudice in such cases, a petitioner must show a "reasonable probability ... he would have prevailed on his appeal" but for his counsel's unreasonable failure to raise an issue. Smith v. Robbins, 528 U.S. 259, 285–86 (2000); see also United States v. Mannino, 212 F.3d 835, 845–46 (3d Cir. 2000) ("The test for prejudice under Strickland is not whether petitioners would likely prevail upon remand, but whether we would have likely reversed and ordered a remand had the issue been raised on direct appeal.").

Although Strickland ordinarily applies to claims of ineffective assistance of counsel, there are three situations where a presumption of prejudice is appropriate. United States v. Cronic, 466 U.S. 648, 659–660 (1984). Prejudice is presumed when: (1) the defendant is completely denied counsel "at a critical stage of trial;" (2) the lawyer "entirely fails to subject the prosecution's case to meaningful adversarial testing" such that there has been a constructive denial of counsel; and (3) where, although counsel is available to assist the accused during trial, "the likelihood that any

14

lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of trial." Id. at 659. A finding of *per se* ineffective assistance under any of these three prongs is "an extremely high showing for a criminal defendant to make." Brown v. French, 147 F.3d 307, 313 (4th Cir. 1998). Absent the narrow circumstances of presumed prejudice under Cronic, defendants must show actual prejudice under Strickland. Glover v. Miro, 262 F.3d 268, 275 (4th Cir. 2001).

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. After examining the record in this matter, the Court finds that the arguments presented by Petitioner can be resolved without an evidentiary hearing based on the record and governing case law. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## V. DISCUSSION[6]

### (1) Ineffective Assistance of Trial Counsel

#### (A) Suppression

##### (i) Traffic Stop

Petitioner contends that counsel was ineffective for failing to challenge the stop of the white Porsche on July 12, 2010, which led to the discovery of $44,000 in currency. Petitioner argues that the canine officer should not have been permitted to testify about his canine qualifications, experience as a police officer, and his dog's alert to money and marijuana in Petitioner's car because the stop was pretextual, Petitioner did not consent and the stop exceeded

---

[6] Petitioner filed an 81-page § 2255 petition (not including attachments) and a 15-page Amended § petition. The claims are excessively lengthy, circular, repetitive and overlapping. Any claims or subclaims not specifically discussed in this Order are rejected.

the reasonably related scope of the basis for the traffic stop. Petitioner has filed an affidavit, (Doc. No. 1-2), alleging that he directed counsel to file a motion to suppress because the stop was not legitimate. He contends that officers fabricated the reasons for the stop – driving under the influence – whereas Petitioner had not been drinking so there is no way that officers smelled alcohol on his breath. He claims that he asked officers for a Breathalyzer or blood test to prove he had not been drinking but his requests were refused. The DWI charges resulting from the stop were ultimately dismissed. Petitioner claims that he was prejudiced because the evidence recovered from the Porsche went towards four out of his seven convictions (conspiracy, possession with intent to distribute, and money laundering). The prejudice was compounded by the Government's closing argument that relied on the currency to corroborate of the Government's evidence. Petitioner argues that there is a reasonable probability that the verdict might have been different if the illegal search and currency had been excluded because the currency was the only physical evidence that arguably connected Petitioner to drug trafficking because counsel failed to explain how he accumulated that cash. He seeks an evidentiary hearing to determine the extent of the prejudice from this evidence.

The Government has attached to its Response Statements of North Carolina State Highway Patrol Troopers Ayers and Nash, and a Mecklenburg Police Department Canine Incident Report. (Doc. No. 9-1). Trooper Ayers was stationary on I-77 in a marked patrol car at 3:52 AM when he saw a white Porsche SUV traveling down I-77 at a high rate of speed and accelerating rapidly. (Doc. No. 9-1 at 1). He clocked the Porsche with his radar device at 92 miles per hour in a 55 mile per hour zone. (Id.). Trooper Ayers activated his emergency lights and pulled over the Porsche. The driver, later identified as Petitioner, had a strong odor of alcohol from his breath, his speech was slurred, and his eyes were red and glassy. Petitioner handed Ayers a credit card instead of his

drivers' license, then produced a South Carolina license. Petitioner refused to submit to an alco-

sensor test. Ayers asked Petitioner to turn the vehicle off and step out of the SUV. Petitioner tried

several times to turn off the vehicle using the headlight switch and was finally able to turn it off

with the key pursuant to Ayers' instructions. Petitioner exited the vehicle and stumbled into the

roadway, leaving the driver's door open. Ayers instructed him to get out of the road and close the

door. Petitioner complied and met Ayers at the front of the patrol vehicle. Ayers asked Petitioner

to face forward and submit to a frisk. Petitioner was hesitant to comply and displayed "signs of

aggression." (Doc. No. 9-1 at 1). Ayers radioed for backup. Petitioner finally complied with Ayers'

instructions and he was frisked, which revealed no weapons or contraband. Ayers asked Petitioner

to perform a one-leg stand field sobriety test which he did not perform to Ayers' satisfaction. Ayers

requested that Petitioner perform the horizontal gaze nystagmus test which Petitioner refused.

Petitioner continued to display "hostile behavior." (Doc. No. 9-1 at 1).

At 4:07 AM, Ayers placed Petitioner under arrest for DWI, speeding 92 miles per hour in

a 55 mile per hour zone, and reckless driving. Ayers handcuffed Petitioner and placed him in the

patrol car. At 4:31 AM, Trooper Gray arrived as backup and took custody of Petitioner. Ayers

requested a tow truck for the Porsche. When Ayers approached the Porsche to retrieve the vehicle's

keys for the tow truck driver, he noticed that the interior door panel on the driver's side was undone

from the roof to the floor. He then requested that CMPD bring a canine unit to the location. Officer

Lopez arrived and began a canine sniff around the vehicle. The canine alerted to the vehicle which

led officers to discover a box containing a large amount of U.S. currency and approximately ½

gram of marijuana.

At approximately 5:30 AM Petitioner was transported to Mecklenburg County Jail where

he signed a Highway Patrol "disclaimer of ownership of assets/waiver of rights to notice of

seizure" form denying any knowledge of the currency. At 7:12 AM, Petitioner refused to give a breath sample to measure alcohol level. He was charged with DWI, speeding 92 miles per hour in a 55 mile per hour zone, reckless driving, and possession of less than ½ ounce of marijuana.

In his Reply, Petitioner does not refute the Government's assertion that he was pulled over for speeding at 92 miles per hour in a 55 mile per hour zone. Instead, he argues that the officer's subsequent actions were not reasonably related to the scope of the circumstances that caused the vehicle stop and were prolonged beyond a time reasonably required to issue a ticket. (Doc. No. 12 at 2). He claims that the 40-minute delay between the vehicle stop and the beginning of the vehicle search, then another 38-minute delay for a canine to arrive, were unreasonable. He further argues that whether there was a reasonable suspicion depends solely on whether the interior panel of the door jamb was undone and the record does not contain any testimony supporting such a claim. He contends that the search violated the Fourth Amendment without probable cause, a warrant, or exigent circumstances.

Petitioner's ineffective assistance claim fails because he has not proved that he had a meritorious suppression claim. Petitioner's claim is premised on the argument that he was not actually drunk when his car was stopped and searched, and therefore the stop was pretextual. However, as a general matter, "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred," regardless of the officer's subjective motivations. Whren v. United States, 517 U.S. 806, 810, 813–19 (1996) (citations omitted). Under the objective test for assessing whether a vehicle stop for a minor traffic violation was pretextual, "if an officer has probable cause or a reasonable suspicion to stop a vehicle, there is no intrusion on the Fourth Amendment. That is so regardless of the face that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity."

United States v. Hassan, 5 F.3d 726, 730 (4th Cir. 1993). "[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." Illinois v. Gates, 462 U.S. 213, 235 (1983) (internal quotation marks and citation omitted).

Petitioner's contention that the stop was pretextual and that he did not actually smell of alcohol does not vitiate the validity of the initial stop that was based on speeding. See, e.g., United States v. Kellam, 568 F.3d 125 (4th Cir. 2009) (district court did not err in ruling that the stop of a vehicle for crossing the double center line in violation of state law was constitutional, even though the defendant contended that the stop was pretextual). Nor does the fact that the DWI charges were ultimately dismissed affect the stop's validity. United States v. Williams, 336 Fed. Appx. 376, 378 (4th Cir. 2009) (per curiam) (unpublished) ("The fact that [a defendant] was not ultimately charged with illegal window tint or having obstructed windshield does not conclusively indicate that the officer did not observe probable violations of those types.").

Petitioner's claim that the traffic stop was extended to call the canine unit also fails. Petitioner had already been arrested for speeding and for driving while intoxicated based on failing roadside sobriety tests when the canine unit was called. His reliance on cases where a stop to write a simple speeding ticket is unreasonably prolonged while awaiting a canine unit is therefore misguided. Moreover, officers would have discovered the box of currency and bag of marijuana while conducting an inventory of the Porsche based on Petitioner's speeding arrest even if a canine unit had not been called. See generally Nix v. Williams, 467 U.S. 431 (1984) (adopting the inevitable discovery exception to the exclusionary rule).

Nor has Petitioner demonstrated that there is a reasonable probability of a different verdict had the evidence from the stop been suppressed. There is no reasonable probability in light of the other evidence presented at trial that the result of trial would have been different had the currency

and drugs found in the Porsche been suppressed. Counsel cannot be deemed ineffective under these circumstances for failing to suppress the evidence from the traffic stop and accordingly this claim will be denied.

### (ii)     Tracking Device

Petitioner argues that counsel should have asserted Petitioner's standing to challenge the Government's placement of a tracking device on the Porsche on November 4, 2010, without a warrant. Petitioner alleges that he told counsel that he was the Porsche's owner, which an investigator could have easily confirmed. Counsel should have asserted Petitioner's standing for purposes of suppression without conceding his ownership of the Porsche at trial. Placement of the tracking device resulted in an unconstitutional seizure of two firearms from the vehicle on November 16, 2010. Without the § 924(c) counts, Petitioner's sentence for the marijuana charge would have been 30 years rather than 60 years. He asks for the 30-year firearm sentence to be vacated and an evidentiary hearing to determine the extent of the prejudice.

Counsel moved to suppress the two handguns seized from the Porsche on November 16, 2010, arguing that law enforcement officers' placement of a GPS tracking device on it without a search warrant tainted the seizure of two firearms from a hidden compartment in the car's passenger seat. (3:10-cr-238, Doc. No. 447 at 3). The Government opposed suppression on multiple grounds including: Petitioner's post-Miranda[7] statement to officers that the Porsche belonged to a friend; information from cooperating defendant before the arrest that Petitioner had a hidden compartment behind the passenger seat where he stored firearms; placement of the GPS tracker was based on probable cause and reasonable suspicion and was reasonable under the

---

[7] Miranda v. Arizona, 384 U.S. 436 (1966).

totality of the circumstances; and law enforcement officers acted in good faith. (3:10-cr-238, Doc. No. 452).

Petitioner has failed to demonstrate that his suppression motion would have succeeded had counsel argued standing. An argument that Petitioner had standing to object to the GPS placement and discovery of the firearms would have been contrary to his own statement to police that the Porsche belonged to a friend. See (3:10-cr-238, Doc. No. 452 at 4). He fails to explain why the Court would have accepted evidence of ownership in light of Petitioner's disavowal to police. Petitioner fails to contest the Government's arguments that he lacked an expectation of privacy in the Porsche because he possessed it pursuant to an illegal leasing scheme and due to his status as a probationer.

Moreover, even if counsel came forward with proof that Petitioner owned the Porsche, the Government would have defeated the motion to suppress under the independent source doctrine. See (3:10-cr-238, Doc. No. 653 at 108); (3:10-cr-238, Doc. No. 452 at 5). The Fourth Amendment "is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" United States v. Jacobsen, 466 U.S. 109, 113 (1984) (quoting Walter v. United States, 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting)). The Government presented evidence that law enforcement discovered the guns based on information from a cooperating witness that was independent from the GPS placement and monitoring. This independent evidence would have defeated Petitioner's motion to suppress based on the allegedly illegal GPS even if counsel proved standing.

Additional argument with regards to standing would have made no difference to the outcome of the suppression motion regarding the two firearms, therefore, Petitioner's claim of ineffective assistance of counsel on this ground will be denied.

**(B)** **Duplicity**

Petitioner contends that counsel was ineffective for failing to argue that Counts (4) and (6) are duplicitous. He claims that these counts, which both charged violations of 18 U.S.C. § 924(c), each charged Petitioner with two offenses: (1) knowingly and unlawfully using and carrying one or more firearms in furtherance of a drug trafficking crime; and (2) possessing said firearms and aiding and abetting the same. Because Petitioner was charged with use and carrying in relation to and possession in furtherance, and aiding and abetting, he did not know what charges he actually faced for purposes of preparing a defense and was deprived of a unanimous jury verdict. (Doc. No. 1 at 43). Petitioner claims that neither he nor the Court could have determined precisely how he was alleged to have violated § 924(c). Had counsel objected pre-verdict, the Court would have applied a strict standard and would have dismissed Counts (4) and (6) because the indictment did not fully, directly, expressly, and unambiguously, set forth all the elements necessary to constitute the offense.

Duplicity is "the joining in a single count of two or more distinct and separate offenses." United States v. Burns, 990 F.2d 1426, 1438 (4th Cir. 1993) (quoting 1 Charles A. Wright, Federal Practice and Procedure § 142, at 469 (2d ed. 1982)). "An indictment is impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a separate count for each offense,' and 2) the defendant is prejudiced thereby." United States v. Sturdivant, 244 F.3d 71, 75 (2d Cir. 2001). However, the doctrine of duplicity is not an exercise in formulism. United States v. Root, 585 F.3d 145, 150 (3d

Cir. 2009). A count should not be found impermissibly duplicitous merely because it combines allegations that could have been stated in separate offenses. Id. Rather, a count is impermissibly duplicitous only "when the failure to [state several allegations as separate offenses] risks unfairness to the defendant." Id. "It is black letter law that duplicitous indictments can be cured through appropriate jury instructions." United States v. Robinson, 627 F.3d 941, 958 (4th Cir. 2010).

The Court instructed the jury with regards to Counts (4) and (6) that:

> There are three avenues of proof under which a conviction is possible on this count. The first is using a firearm during and in relation to a drug trafficking crime. The second is carrying a firearm during and in relation to a drug trafficking crime. And the third is possessing a firearm in furtherance of a drug trafficking crime.
>
> **In order to convict the defendant of the crime charged, your verdict must be unanimous that at least one avenue of proof was established beyond a reasonable doubt**.

(3:10-cr-238, Doc. No. 655 at 88) (emphasis added); see (3:10-cr-238, Doc. No. 655 at 90) (instructing the jury with regards to Count (6) that "[y]ou are to apply the instructions that I gave you with regard to Count Four to this count, keeping in mind that you must consider each count, and the evidence pertaining to it, separately.").

These instructions made clear that the jury was required to find unanimously that Petitioner used **or** possessed a firearm in violation of § 924(c). The indictment could not have risked any unfairness to Petitioner under these circumstances and he has therefore failed to demonstrate that counsel performed deficiently or that he was prejudiced. See, e.g., Molina-Sanchez v. United States, 2018 WL 490551 (W.D.N.C. Jan. 19, 2018).

**(C)**     <u>**Sufficiency of the Evidence/Constructive Amendment**</u>

Petitioner appears to contend that the evidence was insufficient to support his conviction of Count (6) because there was no evidence that he knowingly and unlawfully carried one or more

firearms in furtherance of drug trafficking crimes on November 16, 2010. He further argues that the Government's closing argument constructively amended the indictment by suggesting that Petitioner "may have" used and carried the firearm charged in Count (6) on other occasions besides the date charged in the indictment.

The record conclusively refutes Petitioner's claims of insufficient evidence and constructive amendment. Count (6) charged that, "on or about November 16, 2010," Petitioner with using and carrying one or more firearms, and in furtherance of the drug trafficking crime charged in Count (1), possessed said firearms, and aided and abetted the same. (3:10-cr-238, Doc. No. 152 at 5). Count (1) charged that, "[f]rom in or about 2009 to the present," Petitioner conspired to possess with intent to distribute 1,000 kilograms or more of marijuana. (Id., Doc. No. 152 at 1-2). The prosecutor argued in closing that Petitioner possessed the firearms "in furtherance of drug trafficking" because he had firearms in his house where he stashed money, drugs, and paraphernalia, and in his Porsche on "November 16th," noting that he used the Porsche to pick up couriers and which he stashed money and a firearm that he "might have needed … when he was bringing the couriers with money to the airport or the drugs back." (Id., Doc. No. 655 at 62-63). The Government's argument that Petitioner might have also had a firearm in his Porsche on days other than November 16, 2010, does not render the evidence of his possession on that date invalid. There could be no jury confusion on this point because the Court instructed the jury that Count (6) was alleged to have occurred on November 16, 2010. (3:10-cr-238, Doc. No. 655 at 90). The verdict for Count (6) confirms that the jury found Petitioner guilty of violating § 924(c) or aiding and abetting that offense "on or about November 16, 2010." (3:10-cr-238, Doc. No. 490 at 2). The jury is presumed to have followed the Court's instructions and nothing in the record supports

Petitioner's contention that there was insufficient evidence of the offense as charged or that a constructive amendment occurred. Therefore, this claim will be denied.

**(D)**     **Jury Selection**

Petitioner contends that counsel was *per se* ineffective for becoming confused during jury selection and allowing a personal friend and neighbor of prosecutor Steven Kaufman to be empaneled. Counsel said he was unfamiliar with the Court's jury selection process, expressed confusion because he wanted Timothy Shaw excluded, and sought to re-open the jury selection process which the Court denied. As a result, Shaw was empaneled and acted as jury foreman. Petitioner claims that there is a "possibility" that Shaw may have sympathized with the Government's version of the facts and that Shaw's closeness to the prosecutor may have influenced the finding of guilt. (Doc. No. 1 at 53).

As a preliminary matter, Petitioner has failed to demonstrate the existence of any of the three circumstances in which <u>Cronic's</u> *per se* ineffective assistance standard would apply. He has not shown that counsel was absent at a critical stage of trial, that counsel was constructively absent, or that circumstances existed such that there was a small change that even a fully competent lawyer could have provided effective assistance. <u>Strickland</u> therefore applies and Petitioner is obligated to demonstrate both deficient performance and prejudice.

Petitioner has failed to establish that counsel was ineffective under <u>Strickland</u>. The record reveals that the prosecutor's children and those of Timothy Shaw had played at the same park on a few occasions. (3:10-cr-238, Doc. No. 651 at 43-44). Shaw had no other personal or professional relationship with the prosecutor and there was nothing about having seen Mr. Kaufmann at the park that would impair Shaw's fairness and impartiality. (<u>Id.</u>, Doc. No. 651 at 44). Even if Petitioner had demonstrated that counsel performed deficiently, this claim would still fail because

he has not established prejudice. Petitioner's conjecture that Shaw could have possibly been sympathetic to the prosecution because he had met Mr. Kaufman before is too speculative to support a claim of ineffective assistance of counsel. See, e.g., United States v. Fulks, 683 F.3d 512, 522 (4th Cir. 2012) (argument that counsel could have conceivably empaneled a marginally more sympathetic capital jury that might have imposed a life sentence rather than the death sentence the defendant received, was speculative). This claim will therefore be denied.

### (E) Cross-Examination

#### (i) Stephanie Peppers

Petitioner argues that counsel failed to adequately cross-examine and impeach Stephanie Peppers with a copy of the car rental agreement that showed her son's name. He claims that counsel allowed Peppers to avoid the question which gave the jury the perception that the cross-examination was not based on facts. Had counsel adequately addressed this matter, it would have refuted the Government theory that Petitioner was on the lease agreement and was therefore a coconspirator in a load of marijuana. It also would have shown that the authorities made assumptions about Petitioner being involved in drug trafficking for which Peppers' son Alex Bell was never accused. Counsel's cross examination failed to show bias by law enforcement officers.

This claim is refuted by the record. The rental agreement for the vehicle that Peppers rented for Champ was received in evidence and published by the jury. The "stated renter" on the agreement was Peppers and the listed "references" included Petitioner and Peppers' son Alex Bell. (Id., Doc. No. 653 at 59-60). Counsel cross-examined Peppers about having listed her son as a reference but she could not recall having done so. (Id., Doc. No. 654 at 83-84). Counsel was not deficient for failing to question Peppers further about a peripheral matter that she could not recall. There is no reasonable probability of a different outcome had counsel further questioned her

because she said she could not recall the matter and the jury had the rental agreement before it. The jury could determine Peppers' veracity by considering her testimony and the other evidence including the rental agreement.

Petitioner's general argument that Peppers changed her testimony between her initial statement and trial is too vague and conclusory to support relief. See generally United States v. Dyess, 730 F.3d 354 (4th Cir. 2013) (vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the district court).

### (ii) Mark Hunt

Petitioner argues that counsel failed to challenge Mark Hunt about his debriefing on January 2, 2012, when he could not identify Poo,[8] Chucky[9] or Turtle in a photo lineup. Had counsel impeached him, it is likely the jury would have disbelieved Hunt's testimony about firearm possession and purchase of firearms. He argues that counsel allowed Hunt to present a litany of prejudicial testimony without challenging it. If counsel had impeached Hunt about failing to identify Poo, Chucky, and Turtle in a photo lineup during his debriefing, there is a likelihood that the jury would have disbelieved his testimony about firearm possession and the purchase of firearms. (Doc. No. 1 at 59-60).

Hunt testified that he was a mule in the conspiracy and took money from Charlotte to California on three or four occasions. (3:10-cv-238, Doc. No. 654 at 111). He testified that he also did legitimate contracting work for Petitioner and Peppers. While working on Petitioner's condo, Petitioner asked Hunt to locate some firearms for him and he did so, procuring a .45 Smith and Wesson as a middleman and selling him his personal Tactical 9 Cobray. (Id., Doc. No. 654 at 118). After Petitioner was arrested, Hunt went to see Petitioner in the Mecklenburg County Jail and

---

[8] Co-defendant William Pierce (Id., Doc. No. 653 at 184, 196).
[9] Co-defendant Glenn Carrera (Id., Doc. No. 653 at 67).

Petitioner asked him to make false receipts made out to Petitioner's restaurant. (<u>Id.</u>, Doc. No. 654 at 115-16).

On cross-examination, Petitioner denied knowing Poo but had seen his face and admitted that he knows Turtle and Chucky. (<u>Id.</u>, Doc. No. 654 at 127-28). On redirect, he testified that he did not recognize a picture of Poo. (<u>Id.</u>, Doc. No. 654 at 131). He testified that he is required to cooperate and tell the truth as part of his plea agreement, and that he was "absolutely" hoping for a lighter sentence by cooperating. (<u>Id.</u>, Doc. No. 654 at 128, 132).

Assuming that Hunt failed to identify Poo, Turtle, and Chucky in a photo lineup during his pre-trial debriefing, there is no reasonable probability that cross-examination on this issue would have changed the trial outcome. Whether or not Hunt recognized photographs of Poo, Turtle, and/or Chucky prior to trial has no bearing on his testimony that he transported cash from Charlotte to California for Petitioner on three or four occasions and that he sold two firearms to Petitioner. Reasonable counsel could have concluded that cross-examining Hunt on this issue would not have been helpful, or could have harmed, the defense. <u>See generally Hoots v. Allsbrook</u>, 785 F.2d 1214, 1221 (4th Cir. 1986) (counsel's failure to impeach by collateral means did not undermine the court's confidence in the result of trial because, although it was possible that impeachment might sufficiently have shaken the witness' credibility to tip the reasonable doubt balance, it was at least equally possible that the attempt to impeach by collateral means would have been viewed by the jury as an "unwarranted, desperate effort to discredit a witness whose testimony was intrinsically and by demeanor wholly credible.").

To the extent that Petitioner argues that there were other inconsistencies between Hunt's initial statement and trial testimony, this claim is too vague and conclusory to support relief. <u>See</u> <u>Dyess</u>, 730 F.3d at 354.

### (F) Jury Instructions

Petitioner contends that counsel was ineffective for failing to request buyer-seller and multiple conspiracy jury instructions. (Doc. No. 1 at 77). The Government depicted Petitioner as a marijuana dealer selling pounds of the drugs to others for sale. However, Petitioner claims there is no evidence that Petitioner had a stake in anyone else's distribution or that Petitioner agreed to commit a crime that consisted of the sale itself and the alleged sales were episodic. The jury therefore should have been told that the agreement (conspiracy) cannot be equated with repeated transactions. The buyer/seller instruction reminds juries that distribution of drugs is not itself conspiracy. The jury could have concluded that Petitioner and others dealt without any express or implied undertaking to commit any future crime cooperatively, making them substantive offenders but not conspirators. Petitioner also argues that counsel should have requested a multiple conspiracy instruction but failed to do so because he was tired and abandoned the case. Had counsel performed effectively, the jury could have connected Petitioner to one conspiracy and the drugs dealers[10] to a separate conspiracy.

As a preliminary matter, counsel's comment that he would like to go into closing arguments first thing the following morning "[b]ecuase I think the jury's tired, like me" does not indicate that counsel abandoned the case or was commenting on anything other than whether to break for the day or continue with the proceedings. (3:10-cr-238, Doc. No. 654 at 221).

Petitioner's contention that counsel was ineffective for failing to request a buyer-seller jury instruction is meritless. To establish a drug conspiracy under 21 U.S.C. § 846, the government must prove that "(1) [the defendant] entered into an agreement with one or more persons to engage in conduct that violated 21 U.S.C. § [ ] 841(a)(1) ...; (2) that [the defendant] had knowledge of that

---

[10] Petitioner claims that Jerry Davis and Milton Adams should have been considered to have a separate conspiracy.

conspiracy; and (3) that [the defendant] knowingly and voluntarily participated in the conspiracy." United States v. Howard, 773 F.3d 519, 525 (4th Cir. 2014) (quoting United States v. Mastrapa, 509 F.3d 652, 657 (4th Cir. 2007)). Given the "clandestine and covert" nature of conspiracies, the government can prove the existence of a conspiracy by circumstantial evidence alone. United States v. Burgos, 94 F.3d 849, 857 (4th Cir. 1996) (en banc). A mere buyer-seller relationship is insufficient to support a conspiracy conviction. United States v. Hackley, 662 F.3d 671, 679 (4th Cir. 2011). However, such evidence "'is at least relevant (i.e. probative) on the issue of whether a conspiratorial relationship exists.'" Id. (quoting United States v. Mills, 995 F.2d 480, 485 n. 1 (4th Cir. 1993)). "[E]vidence of continuing relationships and repeated transactions can support the finding that there was a conspiracy, especially when coupled with substantial quantities of drugs." United States v. Reid, 523 F.3d 310, 317 (4th Cir. 2008) (citing Burgos, 94 F.3d at 858).

The evidence at trial revealed that Petitioner established a marijuana business and was the leader of a marijuana trafficking conspiracy involving between 1,000 and 3,000 kilograms of marijuana. Through his networking efforts Petitioner located a contact in California from whom he could purchase large amounts of marijuana, borrowed $5,000 from Peppers to begin the business, enlisted multiple couriers to transport 100 pounds marijuana and around $50,000 in cash at a time between Charlotte and California which involved close to 75 airline tickets, had several people in Charlotte selling marijuana for him, used a TSA contact to help the couriers clear airport security, and orchestrated multiple bank transactions under $9,000 to facilitate the business. This evidence established a continuous conspiracy rather than a mere buyer-seller relationship. Even if counsel had requested such an instruction, it would have been denied. See, e.g., Mills, 995 F.2d at 480 (defendant charged with drug conspiracy was not entitled to a buyer-seller instruction where there was evidence that the relationship went beyond a buy-sell transaction where there was

evidence that the defendant bought and sold cocaine and assisted a co-conspirator in housing the cocaine and traveling for the purpose of selling the cocaine).

Petitioner's contention that counsel failed to request a multiple conspiracy instruction is conclusively refuted by the record. Counsel requested such an instruction and the Court granted the request. (3:10-cr-238, Doc. No. 654 at 12-13). The instructions that the Court provided correctly stated the law of conspiracy including that "[i]f you find that the defendant was not a member of the conspiracy charged in the indictment, then you must find him not guilty, even though the defendant may have been a member of some other conspiracy." (Id., Doc. No. 655 at 68-70).

No jury instruction error occurred and counsel cannot be deemed ineffective for failing to procure more or different instructions.

**(2)**     **Ineffective Assistance of Appellate Counsel**

Petitioner contends that appellate counsel was ineffective for failing to challenge the sufficiency of the evidence to support convictions of Counts (4) and (6). He argues that the Government had to show that the guns seized on November 2 and 6, 2010, were carried "during and in relation to" a drug trafficking crime, which the Government failed to do. At a minimum, the Government had to prove that the firearm had some purpose or effect in the drug trafficking crime or facilitated such a crime but did not do so. He further argues that there was no evidence linking firearms in the Porsche to his distribution of marijuana. Had counsel raised this argument on appeal, he contends, there is a reasonable likelihood that he would have prevailed.

Section 924(c) provides for an enhanced sentence for anyone who, "during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm...." 18 U.S.C. § 924(c)(1)(A). To sustain

convictions of Counts (4) and (6), the Government was required to prove beyond a reasonable doubt that Petitioner "(1) used, carried, or possessed a firearm (2) in furtherance of a drug trafficking crime." United States v. Howard, 773 F.3d 519 (4th Cir. 2014). Whether a firearm "furthered, advanced, or helped forward a drug trafficking crime" is a factual inquiry. United States v. Lomax, 293 F.3d 701, 705 (4th Cir. 2002). Factors that could lead a finder of fact to conclude that a defendant possessed a firearm in furtherance of a drug crime include: "the type of drug activity that is being conducted, accessibility of the firearm, the type of weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or profits, and the time and circumstances under which the gun is found." Id. "Carries a firearm" is not limited to carrying firearms on the person; "it also applies to a person who knowingly possesses and conveys firearms in a vehicle, including in the locked glove compartment or trunk of a car, which the person accompanies." Muscarello v. United States, 524 U.S. 125, 126-27 (1998). In reviewing claims of sufficiency of the evidence, the relevant question is not whether the appellate court is convinced of guilt beyond a reasonable doubt, but rather, when viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt. United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982).

The evidence was sufficient to support Petitioner's § 924(c) convictions in Counts (4) and (6). Count (4) alleged a § 924(c) violation on November 2, 2010. Officers searched Petitioner's apartment on Closeburn Road pursuant to a search warrant on November 2, 2010. When officers entered the apartment they smelled the strong odor of fresh marijuana and found mail addressed to Petitioner. (3:10-cr-238, Doc. No. 652 at 143, 152). Officers found cash totaling $92,000 located in a safe in the master bedroom closet, in the kitchen area, and in a closet near the front door. (Id.,

Doc. No. 652 at 148). Officers found a loaded Glock firearm, magazines, and 29 bullets underneath the bed in the master bedroom. (Id., Doc. No. 652 at 151). The master bedroom closet also held a money counter, cash, money wrappers, and three cell phones. (Id., Doc. No. 652 at 152, 154, 156, 157). The kitchen held Ziploc baggies that are commonly used to package marijuana for sale. (Id., Doc. No. 652 at 153-54). Officers found .6 grams of marijuana near the front closet. (Id., Doc. No. 652 at 158). In addition, numerous witnesses testified at trial that Petitioner was the head of a marijuana conspiracy and saw Petitioner with guns on several occasions including those kept in his bedroom. (Id., Doc. No. 654 at 46-48); (Id., Doc. No. 653 at 206-07); (Id., Doc. No. 653 at 236-37). This evidence, viewed in the light most favorable to the Government, could have allowed a reasonable jury to conclude that Petitioner possessed the loaded Glock to prevent theft in the apartment where he kept marijuana and large amounts of cash to run his marijuana business. See, e.g., Howard, 773 F.3d at 527 (evidence was legally sufficient to support a § 924(c) conviction where officers found a loaded pistol with a round in the chamber and ammunition in the living room of defendant's house, working police scanners and plastic vial caps were in the adjoining den, witnesses testified that defendant often sold PCP from the shed of his property; even though officers did not find drugs in the defendant's home at the time of the search, "the theory that the presence of the firearm served to protect [defendant] from a potential theft of his drugs or profits is nevertheless a plausible one.")

Count (6) charged Petitioner with violating § 924(c) on November 16, 2010, when two firearms were found in the white Porsche SUV. The Government introduced evidence that Petitioner planned to pick up the Porsche from the dealership on November 16 after repairs were completed. (Id., Doc. No. 652 at 106). Petitioner arrived at the dealership with Champ and went inside to pay the bill. The two men got into the car to drive away and were stopped by officers

who found two semi-automatic pistols in a compartment behind the passenger seat, at least one of which was loaded. (Id., Doc. No. 652 at 108). Stephanie Peppers testified that Petitioner had the compartment installed in California with Turtle's help. (Id., Doc. No. 654 at 50). Peppers had seen a gun there before when Petitioner asked her to retrieve money from inside the compartment. (Id.). Petitioner had used the Porsche to transport Peppers to and from the airport on several occasions when she couriered large amounts of marijuana and currency for Petitioner. (Id., Doc. No. 654 at 39). Viewed in the light most favorable to the Government, the evidence was sufficient to support the § 924(c) conviction based on the firearms found in the Porsche's secret compartment on November 16, 2010. See, e.g., United States v. Gathers, 4 Fed. Appx. 151 (4th Cir. 2001) (evidence was sufficient to support a § 924(c) conviction where there was evidence that defendant knowingly transported a gun in the trunk of a car that he co-owned and was driving while transporting cocaine).

Because the sufficiency of the evidence arguments for Counts (4) and (6) are meritless, "it could scarcely be ineffective of appellate counsel not to raise them." Coley v. Bagley, 706 F.3d 741, 752 (6th Cir. 2013) ("[o]mitting meritless arguments is neither professionally unreasonable nor prejudicial.").

**(3)** **Actual Innocence**

Petitioner contends that he is actually innocent of aiding and abetting in Counts (4) and (6) pursuant to 18 U.S.C. § 2. He argues that Rosemond v. United States, 572 U.S. 65 (2014), is retroactive and renders him actually innocent of those counts because the Government failed to prove that Petitioner had the specific intent to distribute marijuana while possessing a firearm. That is, the Government did not prove Petitioner knew in advance that one of his confederates was going to carry a gun or that Petitioner personally did so on November 2, or 16, 2010.

This claim is procedurally defaulted from § 2255 review because it is a non-constitutional claim that could have been, but was not, raised on direct appeal.[11] Moreover, Petitioner's reliance on the actual innocence exception to the procedural default doctrine is misplaced. Petitioner's claim is based on legal, rather than factual, innocence. See, e.g., Mikalajunas, 186 F.3d at 494. Therefore, his procedural default of this claim is unexcused and this claim is procedurally defaulted from § 2255 review.

Even if this claim was not procedurally defaulted it would fail on the merits. Section 2 provides that "[w]however commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal." In Rosemond, the Court held that, when a defendant is accused of aiding and abetting a § 924(c) offense, the Government makes its case by proving that the defendant actively participated in the underlying drug trafficking or violent crime with advance knowledge that a confederate would use or carry a gun during the crime's commission." 572 U.S. at 67. "[A] person is liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of the offense, (2) with the intent of facilitating the offense's commission," i.e., "with full knowledge of the circumstances constituting the charged offense." Rosemond, 572 U.S. at 71, 79.

The Court need not determine whether Rosemond is retroactive and, if so, whether the evidence satisfied Rosemond, because the evidence was sufficient to convict Petitioner of Counts (4) and (6) under a conspiracy theory. In Pinkerton v. United States, 328 U.S. 640 (1946), the Supreme Court held that the criminal act of one conspirator in furtherance of the conspiracy is attributable to the other conspirators for the purpose of holding them responsible for the substantive offense.

---

[11] Rosemond was issued on March 5, 2014, while Petitioner's direct appeal was pending.

The Court correctly instructed the jury in the instant case that:

> [A] conspirator is responsible for offenses committed by another conspirator if the conspirator was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of, and as a foreseeable consequence of, the conspiracy.
>
> Therefore, if you have first found the defendant guilty of the conspiracy charged in Count One, and if you find beyond a reasonable doubt that during the time that the defendant was a member of that conspiracy, another conspirator committed an offense in Count Three, Four, Five, Six or Seven in furtherance of and as a foreseeable consequence of that conspiracy, then you may find the defendant guilty of that offense, even though the defendant may not have participated in any of the acts which constitute the offense described in those counts.

(3:10-cr-238, Doc. No. 655 at 75).

The jury found Petitioner guilty of the conspiracy charged in Count (1) as well as the November 2 and 16, 2010, offenses charged in Counts (4) and (6). The evidence demonstrated that Petitioner installed a secret compartment in his car to hold guns and drugs, that he purchased firearms during the conspiracy, that he was seen with firearms on several occasions, and that firearms were found in his car and in his apartment on November 2 at 16. See Section (2), *supra*. Counts (4) and (6) were therefore supported by sufficient evidence without regard to Rosemond. See, e.g., United States v. Whitted, 734 Fed. Appx. 90 (3d Cir. 2018) (declining to reach Rosemond's retroactivity where defendant was convicted of a § 924(c) violation under a Pinkerton theory of conspiracy and not under an aiding and abetting theory); United States v. Hill, 2018 WL 3752133 (10th Cir. Aug. 7, 2018) (finding that counsel was not ineffective for failing to raise Rosemond where the evidence was sufficient to convict defendant of violating § 924(c) on a theory of Pinkerton co-conspirator liability). Therefore, this claim will be dismissed and denied as procedurally defaulted and meritless.

**(4)**   **Sentencing Claims**

**(A)**    <u>21 U.S.C. § 851</u>

Petitioner argues that he is actually innocent of the § 851 sentencing enhancement because his prior Mississippi conviction for possession of marijuana does not qualify as a "serious drug offense" or "violent felony" in light of <u>Johnson</u> and is not a "felony" pursuant to <u>United States v. Simmons</u>, 649 F.3d 237 (4th Cir. 2011), and <u>Carachuri-Rosendo v. Holder</u>, 560 U.S. 563 (2010).

Petitioner's contention that his prior Mississippi conviction was not a felony for purposes of § 851 pursuant to <u>Simmons</u> and <u>Carachuri-Rosendo</u> is meritless. For first-time offenders who possess with intent to distribute at least 100 kilograms of marijuana, the Controlled Substances Act ("CSA") mandates a term of imprisonment of at least five years. 21 U.S.C. § 841(b)(1)(B)(vii). But for offenders who engage in such conduct "after a prior conviction for a felony drug offense has become final," the CSA mandates a term of imprisonment of at least ten years. <u>Id.</u> A separate provision of the CSA defines a "felony drug offense" as a drug-related "offense that is punishable by imprisonment for more than one year under any law ... of a State." <u>Id.</u> § 802(44). In determining the maximum term of imprisonment that a State imposes for an offense, a court cannot rely on hypothetical sentencing enhancements or aggravating factors, but rather, must focus on the conviction itself. <u>Simmons</u>, 649 F.3d at 244-45; <u>Carachuri-Rosendo</u>, 130 S.Ct. at 2586-89.

Petitioner was charged in Count (1) with conspiracy to possess with intent to distribute 1,000 kilograms or more of marijuana, and in Count (3) with possession with intent to distribute a detectable amount of marijuana, both of which violate 21 U.S.C. §§ 841(a)(1). The Government filed a § 851 notice of intent to seek a sentencing enhancement based on a Mississippi conviction for marijuana possession. The criminal disposition and sentencing orders attached to the § 851 notice reveal that Petitioner pled guilty to "Possession of marijuana (6.7 kilos)" in violation of Mississippi Code § 41-29-139. (Crim. Case No. 3:10-cr-238, Doc. No. 218-1 at 9). A violation of

§ 41-29-139 involving possession of more than five kilograms of marijuana is a felony under Mississippi law.[12] See Bailey v. State, 837 So. 2d 228, 233 (Miss. Ct. App. 2003) (simple possession of more than thirty grams of marijuana in violation of Miss. Code Ann. § 41-29-139(c)(2)(C), is a felony); see McKlemmury v. State, 947 So. 2d 987 (Miss. 2006) (violation of Miss. Code Ann. § 41-29-139(a)(2) is a felony as long as the state proves the defendant knowingly possessed the drugs in question). Petitioner was sentenced to 10 years' imprisonment, one year of which was to be served with credit for time served, the remaining nine years were suspended, and he was placed on five years of probation. (Id., Doc. No. 218-1 at 11). Petitioner's Mississippi drug conviction was therefore punishable by more than one year in prison and supported the sentence enhancement pursuant to §§ 841 and 851.

**(B)**     **18 U.S.C. § 924(c)**

Section 924(c) prohibits using or carrying a firearm "during and in relation to any crime of violence or drug trafficking crime…." A "drug trafficking crime" is "any felony punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46." 18 U.S.C. § 924(c)(2).

Petitioner was indicted in Counts (4) and (6) for using and carrying one or more firearms during and in furtherance of a drug trafficking crime and aiding and abetting the same in violation of 18 U.S.C. §§ 924(c) and 2. The predicate offenses for those counts are possession with intent to distribute marijuana as charged in Count (3), and conspiracy to possess with intent to distribute marijuana as charged in Count (1), both of which are CSA offenses punishable by more than one year in prison. See 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (b)(1)(D). The predicates for Counts (4) and (6) are thus both "drug trafficking crimes" under § 924(c).

---

[12] It appears that the conviction was for simple possession rather than possession with intent to sell as stated in the PSR. This apparent error is irrelevant, however, because both offenses are felonies under Mississippi law.

38

Therefore, even if Petitioner's sentencing claims were not time-barred, they would fail on the merits.

## VI.     CONCLUSION

For the foregoing reasons, the Court will dismiss and deny Petitioner's § 2255 Motion to Vacate and Amended § 2255 Motion to Vacate.

**IT IS, THEREFORE, ORDERED** that:

1.     Petitioner's § Motion to Vacate, (Doc. No. 1), and § 2255 Amended Motion to Vacate, (Doc. No. 2), are **DISMISSED** and **DENIED**.

2.     **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability.  See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

Signed: October 26, 2018

Robert J. Conrad, Jr.
United States District Judge